May it please the Court, Christopher Lovell for the appellant plaintiff in this securities action in which at the motion-to-dismiss stage, the complaint was dismissed under Rule 12b-6. We sent in a supplemental authority letter last week on South Ferry and Gilead, two decisions by this Court. South Ferry basically took the trouble to review motion-to-dismiss cases decided in the federal securities law context by this Court, and to point out how those cases had dismissed the complaint based on what was not in the complaint, that is, an absence of particulars or details. South Ferry went through Silicon Graphics and Veintif and ReadWrite cases. And then it said, after taking the trouble to do that, we can't do things that way anymore. Under Tell Labs, the Supreme Court case, an absence of allegations or a not very particularized allegation has to be weighed. Counsel, I'm actually not having trouble in this case. My colleagues may have a different thought about it. I'm actually not having trouble with the legal arguments you made. What I'm having trouble with is how the record provides a predicate for them. More specifically, I don't exactly understand what the lie is. There has to be a lie, and I can't find it. All I can find, and there has to be scienter knowing that it's a lie. And I can't find that. It looks as though the focus here is that they said that they had good internal controls and that, let's see, I think this was the one where there was a lot of fighting in the board. This fellow Lee and his ally on the board were on one side and Toronto, and there were other people on the other side. It looks as though under traditional derivative suits for breach of fiduciary duty relating to competence or things like that, there might have been a claim. But under the theory of securities fraud, I don't see what the lie and the scienter are. So could you identify them with precision? Yes, Your Honor. Well, first of all, in Wells Fargo, this Court was kind of a seminal decision, said if you take the trouble to speak about internal controls, you have to say it correctly. Well, second of all, I'm just going to go to the facts first. Okay. Here's the facts, Your Honor. I've got your complaint here. Well, if I may, what we're really saying, what it boils down to is founder of the company Lee had no intention to give up his control, his improper control. But please listen to what Judge Kleinfeld is saying here. You've got to establish the predicate here because we're dealing, you know, under the PSLRA, which has these heightened pleading requirements. That's really the problem you're dealing with here. We understand the basic theory of your claim, but where is the scienter? Where are the specifics that he was talking about? Okay. So to answer Judge Kleinfeld's question, the specifics are all the facts we plead, which are inconsistent with public representations that Defendant Lee intends to turn over control to somebody else. Counsel, the district court gave you four shots, that's a lot, to amend your complaint to comply with the PSLRA. And in each instance gave you, told you exactly what you needed to do to comply. And you've got situations in here where you're relying upon people who weren't even employed by the company or had no direct knowledge about the company. I mean... Judge Smith. Sorry for interrupting. Sorry. Go ahead. I mean, that's the problem we're dealing with here. Well, but the problem is an unnecessary problem. In fact, it's an improper problem under South Ferry, Your Honor. What the judge told us to plead, which is basically, it's in this, the latest... You're saying that South Ferry, one of our three judge panels overruled what all the other panels have said? Yes. What authority did that three judge panel have? Tell labs from the Supreme Court, Your Honor, I understand the contradiction. Yeah, I mean, unless you've got a Miller case situation here. No, no. Only an en banc panel can overrule everybody else, okay? So I think what we're really talking about here is based upon the Supreme Court cases and our law, where have you met the burden as described in the PSLRA? With the greatest respect, Judge Smith, I first have to say that tell labs changed the burden. No longer must you plead a particular. The Court, Your Honors, and everybody else according to South Ferry's interpretation... I don't think you understood what Judge Smith said. He said it couldn't change the burden. All a three judge panel can do is interpret the other three judge panel decisions. It can't change it. Well, but what this panel, South Ferry, is saying and what the Gilead panel and two other panels have said, Your Honors, is as follows. There's now been an intervening Supreme Court decision, tell labs. Under tell labs, we can't proceed the way we used to. Tell labs requires us to look holistically at all the allegations. That's what the district court didn't do. The district court, you know, Your Honor, the district court said this. You have to have an eyewitness to the defendant's intention on November 11th. I've done 60 trials. Very rarely have I had an eyewitness to the intention. On the contrary, the standard jury charge is you prove intent through circumstances. And the PSA... I'm not sure I see where tell labs is that good for you. Could you point me to the right page and language? Sure. I think that... Yeah. Yeah, I think that what South Ferry focused on was 127 Supreme Court, 2509 to 2511. Now, at 2509, there's three premises. I'm looking at the official slip of opinion there. At 2511, it's 2509. What's the... I don't have the slip of opinion. Sorry. See, what bothered me was I looked there and it looked like, yeah, I already knew that. Did you consider everything? It says that the pleading has to specify each statement alleged to have been misleading. That's why I asked you what was the lie. Right. And it has to state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind. And that's why I asked you about the scienter. Yes, I... You kind of know it's a lie. Yes, I'd like to get to that, Your Honor. But just to say, they also said, and this is where they differed from the prior decisions of this Court, that omissions and ambiguities count against inferring scienter, but they must still be properly considered with the total mix. So, you know, why, for example, when somebody's already left the company, would have had no opportunity to know firsthand what was going on, why would you cite that person as the basis for your allegation? Well, Your Honor, in the Dow case, this circuit went into what it takes for confidential sources, and it copied the second... Even if they're confidential, if they're not there, they can't see it. They can't hear it. Well, just I'm trying to get to the answer, Your Honor, please. They said that there's two standards. If you rely solely on the confidential source, you're held to a high standard. If you have corroborating circumstances and confidential sources, then the court is to the extent that they're following this First Circuit augmented standard, then we're to look at everything. Now, here's what we pled about these confidential sources. They left the company after the first... Three of them left after the first representation, July 2004. The first representation was June 24th, 2004. We intend to change. We intend to exemplify corporate governance. Lee quit as, I can't remember the name of his office, president or something. He was CEO and president. That's correct, Your Honor. But he didn't relinquish his duties. We intend to have a world-class CEO drive the company. He quit as president. He stayed on the board, continued making trouble. A lot of founders do that sort of thing. Well, Your Honor, he didn't give up the CEO's position, and he took away the CEO responsibilities from the new CEO. He caused six directors to resign, the outside auditors to resign, the CEO to resign. It's really bad management. The chief accounting. It's really bad management, and it might give rise to a traditional breach of fiduciary duty claim, which was not made. But it's not a lie. I appreciate the distinction, Your Honor, and that's what's been argued in Wells Fargo and other cases. However, when you represent to the public that you intend to exempt, he says, I will relinquish the CEO position. Let's say, let's say, let me give you a hypothetical case. The corporation represents to the public, we are very well managed, and we are going to be even better managed in the future. In fact, they are not so well managed, and they are not going to be any better managed in the future, because they have a real jerk who has more power than anyone else. That strikes me as pretty analogous to this case, as pleaded. I don't know if Lee really is as bad as the pleading suggests, but let's say he is, because we have to assume that. It's not a lie. I agree that in that case it's pretty vague. All it is is an opinion about himself. Your Honor, what happened in this case, though, is different from your hypothetical. I agree that that's pretty vague, Your Honor, if that's all there was. Here, the whole problem started in 2003 when Lee informed his co-founder that there was an audit committee investigation of revenue recognition issues. That's paragraph 132. The co-founder went out and sold stock. But Toronto sold stock. No, no, no, that's not Toronto. This is Mr. Jiang, who was the co-founder. Toronto came later with the president. Was it pursuant to a registered sale program? No, no, no, no, no, no. He's outside the company now. He's not with the company. So he runs and sells the stock. And then the announcement is made 11-14, seven days later. The stock falls 28 percent. He's made a profit by selling it. That's an insider trading issue, but what does that have to do with what you've pledged? Well, what it has to do with is then on 217-04, the stock falls 28 percent because the audit committee is investigating that Lee was overriding revenue recognition practices. On 217-04, paragraph 41, three months late, the company finally files its required 10-Q. And they say, our audit committee is in a process. We're going to have to change everything at the company. The stock is going down. May 10, 2004, the first quarter 10-Q comes out. They say, we have some weaknesses. Our outside auditing firm, Pricewaterhouse, says that our chairman's management style, he gets involved in discussions of revenue recognition, he does all this, creates a material weakness. We have five steps underway that we're going to change this. On June 24, that's when our class period begins. That's the first representation. Quote, my decision to relinquish the CEO role is driven by two factors. One, the company is doing okay. Two, I am committed to exemplifying good corporate governance. Two months later, he forces the CFO to resign. Three months later, this is seven days after the – So why was I am committed to good corporate governance? And he was – he intended to keep his control as all the resignations, 10 or 12 resignations over the next year. That's a clear court decision you cited. Tellab says an inference isn't enough. It has to be a strong one. And that goes on to explain how much is required for strong. Yes, yes. Now, it seems that the most natural inference from I'm committed to good corporate governance is either he really is committed to good corporate governance or he imagines that the way he injects himself into corporate governance is good. No, no. It goes further, Your Honor. He says we're going to separate the CEO and the chairman. And then the minute the chairman comes in – the chairman told us. It's in the complaint. The minute the chairman comes – new CEO comes in, pardon me, he starts taking away the CEO's powers. You can't – Your Honor, it's like what the panel in South Ferry's boiled Tellab down to. You've got to use common sense. If somebody beforehand is causing insider trading – the SEC brought the complaint. That's admitted – is causing revenue recognition to be abused, is causing these other problems of lack of controls, and then afterwards is driving out all the executives who try to implement that representation, we're left with one of two things. Recidivism. He really believed it at the time, but he lapsed back later. Or you connect the dots. And what the analyst said was, just plain common sense, this is an embarrassing fact pattern. We've never seen anything like this with all the people driven out. In certain circumstances, if they hadn't made any representations, I agree, Your Honor, there wouldn't be something that's actionable. But once you make a statement under Rule 10b-5, it need not be a lie. It can just be misleading. Here it was a lie. He did not have the intention. And when we plead a fact pattern with all these facts that show all these facts – He did not have the intention to do what? To give up control. He kept control. And anybody who got in his way had to leave the company, Your Honor. And that is worthy to go forward in discovery. That was his intention. And that is the lie in what he said then, and it's the lie in what the – he's quoted at length in the June 24th press release. He's again quoted in the November 11th press release. Those are our two best things. And right after he's quoted in the November 11th press release that he's committed to working with the new CEO, the CEO says right away, he started to curb my powers. We tried to get around it, and I was relieved. And finally, he drives the board out. It's like somebody who moves into a farm and all the animals have to leave. They all said publicly, we're going to go towards this poll star, good corporate governance. Not him. He drove everybody out. He went to those lengths and those extremes to drive everybody out. Some of it is fraud by hindsight, so to speak, because the events come after these two representations. But under Hellwig v. Vencore, they come right after. As soon as the person – the new CEO comes in, he starts cutting his power back to be consistent with his – with the CEO's – with the former CEO's old way of dealing. The connection – So the core lie is I intend to give up control. Yes. I intend to observe good corporate governance, which means I can't determine the auditing and everything in the company. Some things are so much a matter of opinion that it's hard to even call them a lie, like good as opposed to bad corporate governance. Why, at any particular election, half of the Americans think that the other half voted for bad governance? That, I think, would be different, though, Your Honor, from saying I intend to give up control and not giving up control and driving everybody out who wants to stick to it. I think that we're far beyond the coin toss here with all these other facts. I mean, the analyst said, I've never seen anything like this. It's paragraph 78, C and D. We've never seen anything like this. So I don't think it is just like the normal – He must be a very young fellow, never to have seen a founder run his company into the ground. Dr. Lee? Well, I mean – The analyst. The analyst. Yeah, the analyst. He hasn't seen somebody who's run his company into the ground. Well, that's true on human nature, but still, people in my class, my client, went out and bought the stock. Here's what happens to the stock price. On June 24th, they say, we intend to change. We're going to exemplify good corporate governance. All these past problems aren't going to happen. The stock goes up 20 percent that day, November 11th. We've done it. We've brought in the new CEO. Quote the chairman, I intend to work with the CEO. The stock price goes up. During this six-month period, Tirado, who becomes the CEO after the CEO leaves and is the second individual defendant, sells 98 percent of his stock. The fundamental problem that I'm having with your theory is that Lee rode the stock all the way down, and the fact that he rode the stock all the way down instead of selling out suggests that he believed what he was saying, even if he was wrong. I don't get that connection. I think he believes he wants to have control, and it's worth it. If I say, we're going to have great profits and great governance and all these wonderful things in the corporation, and the stock goes up, and I sell all my stock, and then since I knew I was lying, and we're going to have bad profits and bad corporate governance, it goes down, not my problem. I sold out. But if I say, I think we're going to do really well, have good governance and good profits, and I hold on to every share I've got, and it keeps going down, that's evidence that I believed what I was saying, even though I was mistaken. He did sell some, Your Honor, but he was already a very wealthy man when this happened. He already had a lot of wealth. The incremental amount to his wealth may not be nearly as important as keeping control, and keeping control of what he founded. And the fact that he would drive everybody out who was there indicates keeping control is the concern rather than the stock price. Tirado sold before the bad news started to come out. I see I'm way over my time, Judge. Sorry, I'm trying to answer the question. Thank you, counsel. Good morning, Your Honors. May it please the Court. Emmett Stanton for the appellee's defendants in the court below. This is a very odd species of fraud. There is no objectively false statement or any statement that can be proved objectively to be false. There are no accounting issues, no revenue recognition, no bricks shipped with a fake product. Could he deal with the contention I'm going to give up control as a lie because he never intends to give up control and doesn't? It would be true that someone who made that statement without any intent to perform it could be performing a lie or committing a lie. But if we look at the context of what Dr. Lee actually said in that June 24th statement, the first statement was, we are committed to exemplifying good governance here at Silicon Image. Therefore, I am going to we're going to separate the roles of CEO and chairman of the board. I'm going to step down as CEO. It really can't be a lie because they did exactly that. The argument is not that the company failed to separate the roles of CEO and chairman of the board, but rather that six months later when the new CEO was brought on, he and Dr. Lee did not partner as effectively as Dr. Lee anticipated. On the day of the hiring in November 2004, when Mr. Laub is brought on, what Dr. Lee says is, we're delighted to have this new CEO with whom I will partner going forward. There is this inherent tension always when a founder steps aside and a new CEO is brought on board. This one is compounded because the founder continues as chairman of the board, but he also in an operational role reports to the CEO. So he is both a boss in a sense, as the chairman of the board, and a subordinate in another sense in an operational capacity. It's hard for me to understand how... Was the relationship, at least on an organization chart, reported in the periodic reports? In other words, did the public know, the shareholders know, on an organizational box, where Dr. Lee fit, where Mr. Laub fit, and who reported to whom? I don't recall exactly when those disclosures were made. I do know that at a point in 2005, it was announced that Dr. Lee would be the president of a subsidiary. I just can't recall how early or late that specific announcement was. And, of course, the 10K for the year ending 2004, which would have encompassed that quarter when Laub came on board, that wouldn't have been filed until the spring of 2005 after the Laub resignation. So there may have been a time period there where it was unclear precisely what their roles were, but the announcement had been, I'm stepping aside as CEO, I'm staying on as chairman of the board, I will be an active employee partnering with this new CEO. When Laub resigned, he made it clear it was based upon his conflict with Dr. Lee, right? Absolutely. He said that Lee and I from essentially day one began having differences in respective role and responsibility. Now, I think the crucial point there is tension in a boardroom, even disagreements in a boardroom, even to the level of a soap opera in the boardroom isn't fraud unless there's been a statement or representation to the contrary. There is no requirement in the federal securities law that every disagreement in the executive suite or the board has to be immediately disclosed. Where was the disclosure of that he's going to partner with Laub? To me, that's an important statement because saying he's going to partner with Laub means he's not just going to go fishing. Laub run things. It's the November 11, 2004, press release announcing Laub's appointment. Paraphrasing, I'm delighted to bring on Mr. Laub to partner with me to drive Silicon Image to even greater heights. Thanks. What paragraph of the fourth amended complaint? I don't want to waste all your time with that. I organized it by statements. So it's the second statement. Let me see. I believe it's 64? Paragraph 64? Of the amended complaint. Of the fourth amended complaint. I'm sorry. I don't have it handy, Your Honor. But it is. Give us the 28J letters. Yes. It is the November 11 press release quoted in the complaint and in the court's decision. Your closing counsel made much of the South Ferry case. You heard what he said. Yes. He suggests, I assume, that under Miller that the Supreme Court had decided one or more cases that the logic was such that our earlier cases with respect to the specificity of pleading were no longer operative and we had to take a different perspective. What is your take on South Ferry and what your opposing counsel had to say on that issue? So let's start with Tell Labs, which is a Scientra case, not a falsity case. Right. Right. South Ferry is a Scientra case, not a falsity case. Tell Labs may have adjusted the law in the Ninth Circuit on Scientra. I think it's in Rubke or Zucco, one of the other recent Ninth Circuit cases on Tell Labs. It says it's really the same, but we now have this additional holistic view on Scientra. We take a look at all of the inferences and weigh them. There is no Ninth Circuit case since Tell Labs, nor frankly am I aware of any in another circuit, that says the falsity analysis is different. It was still the case, or it always has been the case in the Ninth Circuit, that you looked at the allegations of falsity. I'll use the word holistic for want of a better term. But you look at all of the allegations for falsity purposes. I think it's really unfair of the way that appellants have criticized the district court for essentially taking a silo approach, looking at a statement in isolation and determining whether it was or was not false. I don't think you can read into the court's, the district court's decision that kind of silo approach. Rather, the judge organized the decision on a misstatement by misstatement basis. How else are you going to organize it? And to suggest that any defect in analysis would be cured by the simple prophylactic at the end of saying, and I've considered all of these allegations, really would exalt form over substance. The district court, as I recall the record, was pretty careful in its orders to say you need to clarify this, you need to clarify that, et cetera, et cetera, et cetera, And that's why it's important to look at the judge, Judge Chesney's order dismissing the third amended complaint and the one on the fourth amended complaint sort of together. The statement of the legal standard is a little more complete when she dismisses the third amended complaint, because in that order it says, here are the specific things I want you to do,  I don't want you to do anything else. Kennedy. Did the plaintiff's appellant cite South Ferry to the district court? No. It hadn't been decided yet. Okay. Now, Tell Labs had, and they made a similar argument about the effect of Tell Labs to the district court, that a holistic approach was necessary. But there's a real danger in blending too indistinctly the scienter analysis and the falsity analysis in a case like this where it is a purely subjective statement that is alleged to be false. Because once you, if you apply to sort of a conventional analysis of inferences and said, well, he didn't behave that way afterwards, therefore an inference is that he didn't really mean it. And then if you go to the Tell Labs holistic approach and say, well, wait a second, he's the only one who really knows whether he meant it or not, and therefore because we've concluded that it's reasonable to infer that it was false, we bootstrap the holistic analysis of scienter and give unnecessary credence to a very thin subjective statement by the principal alleged wrongdoer. Unless the court has questions. The Supreme Court has in many areas of law over the last ten years or so said, no, don't sort things out one by one and then rule them out and then move on to the next. Look at the whole bunch of them together and see what inferences can be drawn from them, or in this case what strong inferences can be drawn from them. What strong inferences? I still haven't found that statement about partner. And I'm wondering whether you're being held. Thanks. Thanks very much. 61. If the founder realizes that he is driving the price of the stock down and he says, okay, I'll get out, and then he doesn't get out, oh, I see my problem. I'm missing three pages of the excerpts. It goes 48 to 51 and skips 49 and 50. That's why I can't find it. What counsel has provided me is the excerpt of the press release quoted in the complaint. I believe that that press release in its entirety had the partner language, but we'll supply the citations directly. If you could both. If the man says I'm getting out, the market thinks he has become a problem, and he says, okay, I'm getting out, and then he doesn't get out, that might be significant. But if he says I'm not getting out, I'm going to partner with this fellow, well, that's significant in countering the inference that he was lying. What he calls partnering, the other fellow calls interfering. So I really want to see it. And I guess I can't see it because two pages are missing from the excerpt. We'll supply it. Both you and your counterpart, if you will, on this narrow issue with a partner, no partner, if you could give me some of the letters, that would be helpful. And maybe with your 28Js you could attach Xeroxes, because my guess is that whatever was sent to the court is missing two pages. That's my guess. Okay. We'll do that. It's similar to the point your Honor made about what inference does one draw from the fact that Dr. Lee never sold any stock. It is inconsistent with the notion that he knew he was lying and knew he was driving the company into the ground and was artificially propping up the stock. So his absence of sales, I think, is quite probative. Mr. Tirado's sales, on the other hand, they're all 10B-5-1 planned sales. They take place every week just according to the schedule. He even buys 100,000 shares in the midst of this alleged conspiracy. And the most that appellants can do with that fact is say he bought 100,000 shares to cover up his wrongdoing. These were planned sales, right, registered with the SEC and so on? Yes. The record includes a summary of them and a schedule. Each of the Form 4s filed with the SEC for these trades identified as pursuant to a 10B-5-1 plan. Thank you. Unless you have further questions, I'm prepared to conclude. Thank you, Counsel. Curry v. Silicon Image is submitted.
judges: Tg Nelson, Kleinfeld, M. Smith, Cjj